UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 1:19 CR 96 SNLJ (ACL) |
| JEROME RODGERS, | ) ) ) |
| Defendant. | ) ) |

## REPORT AND RECOMMENDATION

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).  Pending before the undersigned is Defendant Jerome Rodgers' Motion to Suppress (Doc. 26) statements and evidence obtained following a stop of his vehicle on January 27, 2019.

Rodgers argues that his constitutional rights were violated when the Trooper who stopped his vehicle failed to read him the *Miranda* warning before asking questions that elicited incriminating responses.  He further argues that the Trooper's search of his vehicle was unlawful in that it was incident to an arrest and not based on probable cause.

The Government opposed Rodgers' suppression motion, responding that the *Miranda* warning was not required during the temporary detention of Rodgers since he was not in custody.  (Doc. 28 at p. 4.)  The Government added that an officer's observation of contraband in plain view within a vehicle enables an officer to search the vehicle without consent or a warrant.  *Id.*

After an evidentiary hearing,[1] both parties submitted memoranda. (Docs. 46, 49, 57.)

In consideration of the pleadings identified above, as well as all exhibits admitted into evidence, the undersigned recommends that the following findings of fact and conclusions of law be adopted; and that the Defendant's Motion be denied.

## I. Findings of Fact

The instant Indictment charges Rodgers with possessing methamphetamine with the intent to distribute and carrying a firearm (a 9-millimeter semi-automatic pistol loaded with five rounds of ammunition) in connection with a drug trafficking crime. (Doc. 2.) The gun and methamphetamine were found in Rodgers' vehicle following a traffic stop.

Shortly before 10:00 a.m., on January 27, 2019, Trooper Scoggins was on routine patrol on Missouri Highway 53 in Dunklin County. He observed a Suburban travelling 74 miles per hour when the posted speed limit was 55 miles per hour. Scoggins stopped the vehicle for speeding.

When Trooper Scoggins approached the vehicle, Rodgers was the driver and sole occupant. The Trooper observed a hollowed-out cigar on the center console and scattered tobacco on the front seat. Trooper Scoggins had been an officer for more than 20 years and was familiar with people using cigars modified in that way to smoke marijuana, or a synthetic substance called K-2. In his experience, a hollowed cigar filled with marijuana

---

[1] The Hearing Transcript is Doc. 33 and will be referred to hereinafter as (Tr. at ___).

is known as "blunt." Trooper Scoggins estimated he'd seen hundreds of blunts in his years as a law enforcement officer and indicated that possession of blunts was always associated with the use of illegal drugs.

Rodgers told the Trooper he was headed to the license bureau to get new plates for the Chevrolet Suburban. Trooper Scoggins found that unusual as it was a Sunday and the license bureau was closed. The Trooper asked Rodgers to accompany him to his patrol car. A records check revealed that Rodgers' driver's license was invalid. Additionally, the license plates on the vehicle were for a Chrysler not the Suburban.

Trooper Scoggins advised Rodgers that he intended to issue traffic citations to Rodgers, including: Speeding, Invalid License, Failure to Display Valid Plates, and Failure to Maintain Insurance. While Trooper Scoggins was writing the citations, Rodgers made small talk, including the fact he played semi-pro football in Mexico. Within 15 minutes after the stop, Rodgers received the traffic citations and Trooper Scoggins advised him that two of the citations might be withdrawn if Rodgers showed his valid license and proof of insurance in court. *See* Dash Camera recording (Def. Ex. #3[2]) at 15:10, hereinafter, (Video at ___).

Earlier, when Rodgers exited the Suburban, the Trooper observed a cardboard box of sandwich bags in the driver's seat pushed up against the seatbelt buckle. This was

---

[2] Both the Government and Defendant submitted copies of the recording from Trooper Scoggins' dash camera. The recording identified as Defendant's Exhibit #3 will be referenced herein. The 74-minute long recording begins when Rodgers' speed was detected. The patrol car and Suburban were stopped at the side of the road within approximately one minute.

noteworthy to the Trooper because plastic baggies are not commonly observed in the driver's seats of vehicles, however, they are often used to package drugs.  Trooper Scoggins testified that his observation of the blunt and scattered tobacco in the Suburban, along with the fact Rodgers was sitting on a box of plastic bags that are commonly used for packaging drugs and Rodgers' claim he was headed to the DMV when it was closed, caused Trooper Scoggins to suspect Rodgers was engaged in criminal activity.

After the driving citations were issued, Trooper Scoggins asked Rodgers whether there was "anything illegal in the truck?"  (Video at 15:23.)  Rodgers responded there was a gun in the car.  He noted it was a semi-automatic Smith and Wesson that had previously belonged to his grandfather.  Rodgers further claimed that he didn't keep the gun in his house since he had children and that is why it was in the truck.

One minute after asking if there was anything illegal in the truck, Trooper Scoggins asked the question again.  He explained, "the reason I'm asking is it looked like there was some paraphernalia in the [Suburban]." *Id*. at 16:51.  Trooper Scoggins identified the box of baggies and "little filter thing" as drug paraphernalia.  Rodgers responded that the filter was his vape and the baggies were related to him cleaning the interior of his vehicle and the fact he'd moved everything out of his car into the Suburban, including his clothes.  Trooper Scoggins again asked if there was anything illegal in the vehicle and directly suggested that Rodgers had marijuana.  Scoggins stated, "[i]f there's like a misdemeanor amount of weed in there, we need to go grab it real quick and get rid of it, okay? … I'm just gonna write you a ticket on it …" *Id*. at 17:50-18:01.

Rodgers stalled and giggled a little.  He pulled a small bag of marijuana from his pocket and gave it to the Trooper.

Trooper Scoggins confirmed the gun was in the truck and again inquired if there was "anything else?"  *Id*. at 18:13.  Specifically, Trooper Scoggins asked about pipes and rolling paper which would be needed for Rodgers to smoke the marijuana.  Rodgers replied that there were cigars, but he didn't think they were in the box.

Trooper Scoggins contacted Dispatch and advised "Located a misdemeanor amount of marijuana on the driver.  I'll be out on a vehicle search."  *Id*. at 19:12.  Scoggins placed Rodgers in handcuffs to keep him secure since he was the only officer on the scene.  *Id*. at 19:29.  Instead of leaving Rodgers in the patrol car, Trooper Scoggins decided to have Rodgers accompany him during the search.  During a pat down of Rodgers' person, Scoggins asked if Rodgers had anything else on him that was illegal.  Rodgers noted he had a scale in his pocket.  *Id*. at 20:23.  Once the digital scale was removed, the pair walked to the passenger side of the Suburban.  At Rodgers' request, Trooper Scoggins retrieved Rodgers' phone and attempted to locate a cigarillo box that Rodgers said was in the truck.

Next, Trooper Scoggins instructed Rodgers to stand at the front of the truck.  Scoggins located the gun in the driver's side door pocket, *id*. at 24:50; and he removed a magazine from the handgun.  Trooper Scoggins commented on the fact there was not a round in the chamber.  Rodgers asked for his wallet.  Trooper Scoggins discovered there

was a rock of suspected methamphetamine in the sandwich bag box.[3] The Trooper closed the driver's door, returned to the front of the Suburban, requested back up from Dispatch, and advised Rodgers he was under arrest. *Id*. at 25:48-26:33.

Rodgers denied understanding why he was arrested. While waiting for the backup officer to arrive, Trooper Scoggins and Rodgers remained at the front of the truck. It is not possible to hear the entire conversation between the two on the dash camera video.

The backup officer arrived roughly 31 minutes after the traffic stop was initiated. As the backup officer rounded the front of the Suburban, Trooper Scoggins can be heard saying, "You're under arrest, don't go nowhere." *Id*. at 32:31. Next, Trooper Scoggins returned to the driver's door, opened it, and stated he'd called the backup officer so that he could "check something." *Id*. at 33:12. While searching the Suburban, Trooper Scoggins asked Dispatch if Rodgers had any felony convictions, *id*. at 33:54; he also called the serial number in for the Smith and Wesson handgun, *id*. at 34:52. Dispatch confirmed the serial number checked to a 9 millimeter, .45 caliber handgun.

Trooper Scoggins then returned to his patrol car and retrieved his cell phone. He called another officer to discuss the situation. *Id*. at 37:05-41:29. Trooper Scoggins

---

[3] Rodgers attacks Trooper Scoggins' credibility because his written report indicates that he "observed a large amount of methamphetamine in the box" in plain view. (Doc. 26-1 at p. 3.) Trooper Scoggins did not claim that the methamphetamine was in plain view when he first interacted with Rodgers immediately following the stop. (Tr. at 30.) When Trooper Scoggins approached the Suburban, Rodgers was concealing the box of baggies by sitting on them. Scoggins saw the box of baggies beneath Rodgers when he exited the vehicle. *Id*. at 11-12. It was not until Scoggins searched the Suburban that he was able to view the large rock of methamphetamine in plain view in the open baggie box. *See* Doc. 26-2 (photograph of items seized from vehicle). The Court finds Trooper Scoggins' testimony to be credible.

advised the other officer that he'd stopped Rodgers for speeding and found him to be in possession of a misdemeanor quantity of marijuana in his pocket.  Trooper Scoggins explained that when a search of the car was conducted he found a box of plastic baggies containing a golf ball size rock that he believed to be methamphetamine and Rodgers denied ownership of the meth.  *Id*. at 38:41-39:58.  Trooper Scoggins conducted a further search of the Suburban, including: the interior of the vehicle's rear hatch and the backseat, and the driver's seat area again.  When he was finished, Trooper Scoggins removed the box of baggies containing the suspected methamphetamine and the firearm.  *Id*. at 46:45.  The truck was then moved off the road by Trooper Scoggins.  *Id*. at 48:00-49:30.

Trooper Scoggins and the backup officer escorted Rodgers back to the patrol car.  Once both men were in the patrol car, the following exchange occurred:

| | |
|---|---|
| Trooper: | You're good with your truck sitting here? |
| Rodgers: | I don't know what's going on… |
| Trooper: | You're under arrest for possession of drugs, |
| Rodgers: | Yes, sir. |
| Trooper: | --felony amount; |
| Rodgers: | Yes, sir. |
| Trooper: | possession of the firearm— |
| Rodgers: | okay. |
| Trooper: | in the process…of transporting drugs..., okay? |
| Rodgers: | Yes. |

| | |
|---|---|
| Trooper: | You had a felony amount of drugs in the vehicle. |
| Rodgers: | Okay. I understand that… |
| Trooper: | You saw what I—searched— |
| Rodger: | Yeah, yeah—I'm not— |

*****

| | |
|---|---|
| Trooper: | Let me read you your *Miranda* real quick before we start talking, okay? |
| Rodgers: | Yeah, I want—I want—this is, this is… |
| Trooper: | Just to cover my booty. |
| Rodgers: | Naw, I already know my rights and everything.  I know you gotta read 'em.  I-- |
| Trooper: | I gotta read them.  Then we'll chat.  Uh.  You have the right to remain silent.  Anything you say can be used against you in a court of law.  You have the right to talk to your lawyer and be present with you while being questioned.  If you can't afford to hire a lawyer, one will be appointed to represent you for any question that you wish.  You can decide at anytime to not answer any questions or make any statements. |
| Rodgers: | What I wanna talk about— |
| Trooper: | Now we can talk. |

*Id*. at 51:14-52:17.  Trooper Scoggins explained that Rodgers would have a chance to talk with a narcotics officer in Kennett.  Roughly 53 minutes after the stop was initiated, Trooper Scoggins and Rodgers headed toward Kennett.

Rodgers now requests suppression of the physical evidence that was seized along with the statements he made following the traffic stop.

## II.  Conclusions of Law

Rodgers claims that the Trooper "unlawfully searched [his] vehicle without a warrant or without the authority of any legal exception to search [his] vehicle." (Doc. 26 at 6.)  He further argues that Trooper Scoggins was required to advise him of the *Miranda* warning before asking him if there was anything illegal in his vehicle.  Rodgers does not challenge the validity of the traffic stop.

The Government responded that Rodgers was lawfully stopped based on the fact he was speeding and that Trooper Scoggins' observation of drug paraphernalia within the Suburban gave him probable cause to search the vehicle.  The Government further argued that the *Miranda* warning was not required prior to Rodgers' arrest.

The record supports that Trooper Scoggins performed a valid traffic stop that expanded into an investigative *Terry* stop based on Scoggins' observation of drug paraphernalia in plain view within the vehicle, as well as Rodgers' responses to routine questions.  Considering the totality of the circumstances it was reasonable for Scoggins to believe that additional evidence would be found in the Suburban.  A more thorough analysis follows.

### II.A.  Defendant's Statements Following Stop and Vehicle Search

Rodgers argues "[t]he sole fact that [he] had possession of misdemeanor marijuana in his pocket, did not make Officer Scoggins search of [the] truck legal." (Doc. 26 at 5.) He further argues that the search of the vehicle was not a valid search incident to arrest nor permitted under the automobile exception to the warrant requirement.  *Id*. at 5-6. Rodgers' argument hinges on his conclusion that Trooper Scoggins' search of the

Suburban was incident to his arrest.  Rodgers based that conclusion on Scoggins' statement to the dispatcher that he "located misdemeanor marijuana on the driver, I'll be on vehicle search."  (Doc. 57 at 3.)  Rodger's interpretation is not born out by the record.

**II.A.1.  Valid traffic stops can convert to *Terry* stops**

 "An officer conducting a traffic stop who discovers information leading to reasonable suspicion of an unrelated crime may extend the stop and broaden the investigation."  *United States v. Woods*, 829 F.3d 675, 679 (8th Cir. 2016) (citing *United States v. Anguiano*, 795 F.3d 873, 876 (8th Cir. 2015)).  In situations where an individual is detained after an initial lawful stop, the question is whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place."  *United States v. Cummins*, 920 F.2d 498, 502 (8th Cir. 1990).  Law enforcement officers are entitled to stop and briefly detain an individual for investigative purposes if there is reasonable suspicion that criminal activity may be afoot.  *United States v. Hill*, 91 F.3d 1064, 1069 (8th Cir. 1996).

In *Rodriguez v. United States*, the Supreme Court discussed the sorts of "ordinary inquiries" that officers are permitted to make following a lawful traffic stop, stating:

> Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Delaware v. Prouse*, 440 U.S. 648, 658-60 (1979).  *See also* 4 W. LaFave, Search and Seizure § 9.3(c), pp. 507-517 (5th Ed. 2012).  These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly…

575 U.S. 348, 355 (2015) (Citation omitted).  If the responses provided give rise to suspicions unrelated to the traffic offense, the officer's inquiry may be broadened. *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995).  Under Eighth Circuit law, there is no basis for suppression after a lawful stop and a routine request for identification that yields incriminating information.  *United States v. Cloud*, 594 F.3d 1042, 1043-44 (8th Cir. 2010).  When "complications arise" during the routine tasks of a traffic stop, a longer detention is reasonable.  *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008).

### II.A.2.  Automobile exception

"The Fourth Amendment forbids unreasonable searches and seizures.  It is well settled that a warrantless search of an automobile is not unreasonable if law enforcement officers have probable cause to believe that the vehicle contains evidence of criminal activity."  *United States v. Daniel*, 809 F.3d 447, 448-49 (8th Cir. 2016) (citing *United States v. Ross*, 456 U.S. 798, 823-24 (1982)).  "Probable cause exists when the facts available to an officer would warrant a person of reasonable caution to believe that contraband or other evidence of a crime is present."  *Id.* at 449 (citing *Florida v. Harris*, 568 U.S. 237, 243 (2013).  This conclusion is buttressed by past cases addressing the seizure of contraband from vehicles after officers observed the contraband in "plain view."  *United States v. Rowland*, 341 F.3d 774, 785 (8th Cir. 2003) ("The discovery of razor blades, rolling papers, and a syringe during the *Terry* search was sufficient to create probable cause to search the entire vehicle.").  *See also United States v. Flatden*, 230 F.3d 1083, 1086 (8th Cir. 2000) (observation of "an item commonly used in the manufacture

of methamphetamine … in plain view in the back seat" of an automobile gave probable cause to search other parts of the automobile for further contraband or evidence); and *United States v. Booker*, 269 F.3d 930, 932 (8th Cir. 2001) (citations omitted) (Officer's observation of marijuana residue on the passenger side floorboard of vehicle "generated probable cause to justify the subsequent search of the [vehicle].").

## II.A.3.  *Miranda* warning not required during traffic stop and further detention

"No *Miranda* warning is necessary for persons detained for a *Terry* stop." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003) (quoting *United States v. McGauley*, 786 F.2d 888, 890 (8th Cir. 1986)).

> The Supreme Court has compared routine traffic stops to *Terry* stops.
>
> [T]he usual traffic stop is more analogous to a so-called "*Terry* stop,". . ., than to a formal arrest."  Under the Fourth Amendment, we have held a policeman who lacks probable cause but whose "observations lead him to reasonably suspect" that a particular person has committed, is committing, or is about to commit a crime, may detain that person briefly in order to "investigate the circumstances that provoke suspicion." *United States v. Brignoni-Ponce*, 422 U.S. 873, 881. . .  "[T]he stop and inquiry must be 'reasonably related in scope to the justification for their initiation.'" *Ibid*. (quoting *Terry v. Ohio*. . .Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions.  But the detainee is not obliged to respond.  And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released.  The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*.  The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda*.

*Berkemer v. McCarty*, 468 U.S. 420, 439-440 (1984) (Citations omitted).

Rodgers does not challenge the lawfulness of the traffic stop as he was travelling 19 miles over the posted speed limit. When Trooper Scoggins approached the vehicle to advise Rodgers of the reason for the stop, he observed a hollowed-out cigar; tobacco crumbs; and a "router," or tool used to hollow out the cigar in plain view. When the Trooper asked Rodgers to exit the truck so that the pair could talk in the patrol car, Trooper Scoggins observed a box of plastic baggies that he associated with drug trafficking on the driver's seat. Once in the patrol car, Trooper Scoggins learned that Rodgers did not have a valid license and the plates on the Suburban belonged to a different vehicle. Additionally, Rodgers did not have car insurance. Trooper Scoggins advised Rodgers he was not going to be arrested, rather he was going to be ticketed for Speeding, Invalid License, No Insurance, and Failure to Display Plates.

After issuing the traffic citations to Rodgers, Trooper Scoggins asked Rodgers several questions that confirmed his suspicion that Rodgers was engaged in criminal activity. First, Trooper Scoggins asked Rodgers if there was anything illegal in his truck. Rodgers responded that he had a gun in the truck. Scoggins and Rodgers discussed the gun for one minute. (Video at 15:23-16:35.) Trooper Scoggins asked Rodgers a second time if there was anything illegal in the truck. He explained that he was asking the question because he observed "some paraphernalia" in the Suburban. *Id*. at 16:51. Rodgers asked if the Trooper was talking about a box of "Black and Milds." Scoggins replied he was not considering them. Then Rodgers claimed that what the Trooper perceived as a router was his "vape." *Id*. at 17:16. With regard to the sandwich baggies, Rodgers stated:

Page **13** of **17**

> The baggies? Ohhh! Those was in there, I just was cleaning my truck out, I mean my car out… I-I ain' wanna leave nothin in that car so I just put every-thing in--. See, if you look in there, all my clothes and stuff, I threw those in there. You know I was just getting everything out of that car.

*Id.* at 17:25-17:39.

Since Trooper Scoggins continued to suspect additional criminal activity, he said:

> If there's like a misdemeanor amount of weed in there, we need to go grab it real quick and get rid of it, okay? … Where's it at? 'Cause I'm just gonna write you a ticket on it… If you have it on you, just pull it out...

*Id.* at 17:50-18:12. Rodgers giggled and pulled a baggie of marijuana out of his pocket. Rodgers denied having a pipe or rolling paper. Rodgers admitted he smoked his marijuana with cigars but he didn't think there were any in the box he previously referenced.

After the marijuana was secured, Trooper Scoggins reported to Dispatch that he was going to conduct a search.[4] *Id.* at 19:15. Scoggins advised Rodgers that he was going to handcuff Rodgers during the search since no other officers were present. *Id.* at 19:28. Instead of leaving Rodgers in the vehicle, Trooper Scoggins decided to have Rodgers accompany him. When Scoggins initiated a pat down, he asked Rodgers if there

---

[4] Rodgers argues that Trooper Scoggins' statement to Dispatch means that Scoggins believed he was conducting a search of the truck incident to Rodgers arrest. Rodgers suggests that after he removed the bag of marijuana from his pocket he was placed under arrest. It is true that a search of the truck followed Trooper Scoggins' report of the marijuana discovery to Dispatch, however, Rodgers was not placed under arrest at that time. (Tr. at 12.) Scoggins intended to briefly detain Rodgers while he searched the vehicle. *Id.* at 13. Absent the discovery of the methamphetamine, Trooper Scoggins' plan was to release Rodgers with the tickets. The totality of the circumstances demonstrate that Scoggins' search was based on the fact he had generated probable cause to believe additional evidence of criminal activity would be found in the Surburban.

Page **14** of **17**

was anything illegal on his person.  Rodgers advised he had a set of digital scales in his shoe.  Scoggins secured the scales.  Twenty minutes after the stop was initiated, both the Trooper and Rodgers walked toward the vehicle so that Trooper Scoggins could commence the search.

Within less than four minutes after the traffic citations were issued, Trooper Scoggins' further questioning resulted in him discovering that Rodgers was carrying marijuana and digital scales on his person.  He also learned that Rodgers was carrying a firearm in his vehicle.  This short detention following the conclusion of a valid traffic stop was a temporary detention that did not require Trooper Scoggins to advise Rodgers of his *Miranda* rights.  Furthermore, Scoggins' generated probable cause to justify the subsequent search of the Suburban based on his plain view observation of drug paraphernalia within the vehicle (*i.e*., hollowed out cigar, router, and box of sandwich baggies), as well as Rodgers' admission that he had marijuana and digital scales on his person.

The Court finds that the seizure of the gun, drugs (methamphetamine and marijuana), and digital scales was according to law and not in violation of Rodgers' constitutional rights.  Additionally, Rodgers' statements about the gun, marijuana, and digital scales at the scene of the traffic stop were made during a lawful temporary detention.

Rodgers' request for suppression of the physical evidence seized from his person and vehicle along with his statements at the scene of the traffic stop should be denied.

**II.B.  Statements at the police department**

Rodgers argues that he was subjected to custodial interrogation at the scene of the traffic stop and that his subsequent statements should be suppressed.  (Doc. 26 at p. 5; 46 at p. 6.)  This is a request for Rodgers' statements at the police station to be suppressed as fruit of the poisonous tree.

"[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or 'fruit of the poisonous tree.'"  *United States v. Riesselman*, 646 F.3d 1072, 1078 (8th Cir. 2011), quoting *Segura v. United States*, 468 U.S. 796, 804 (1984).  In addition, "[v]erbal statements obtained as a result of a Fourth Amendment violation are as much subject to the exclusionary rule as are items of physical evidence discovered during an illegal search."  *United States v. Yousif*, 308 F.3d 820, 832 (8th Cir. 2002), citing *Wong Sun v. United States*, 371 U.S. 471, 485 (1963).  "[T]he defendant bears the initial burden of establishing the factual nexus between the constitutional violation and the challenged evidence."  *United States v. Marasco*, 487 F.3d 543, 547 (8th Cir. 2007).

The undersigned found that Rodgers' statements following the traffic stop were given during a lawful detention.  As such the statements he made at the police station do not constitute fruit of the poisonous tree.  *See United States v. Goodale*, 738 F.3d 917, 922 (8th Cir. 2013).  Rodgers did not argue that his statements at the police station were involuntary or that he did not receive the *Miranda* warning prior to making statements at the police station, so those issues are not considered.

Rodgers' request for suppression of the statements he made at the police station should be denied.

### III.  Conclusion

In accordance with the Memorandum above,

**IT IS HEREBY RECOMMENDED** that the Defendant's Motion to Suppress Statements and Evidence (Doc. 26) is **denied**.

Further, the parties are advised that they have fourteen days, not later than February 21, 2020, in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained.  Failure to file timely objections may result in a waiver of the right to appeal questions of fact. *Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990).

_____
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE

Dated this 7th day of February, 2020.